D/PR PACTS # 1880842

**C O N F I D E N T I A L**
**PROPERTY OF U.S. COURTS.**
**This document is not to be disclosed to**
**any party not officially involved in the**
**pre and post sentencing aspects of this**
**case without approval of the Court,**
**Rule 32(e)**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| | ) | **Docket No.:    CR 15-696-32(PAD)** |
| CARLOS LÓPEZ-MELÉNDEZ | ) | |
| | ) | |

**Prepared for:**          The Honorable Pedro A. Delgado-Hernández
                                    United States District Judge

**Assistant United States Attorney**
César S. Rivera-Giraud
E-mail: cesar.rivera@usdoj.gov
Teresa S. Zapata-Valladares
E-mail: teresa.s.zapata@usdoj.gov
Torre Chardón, Suite 1201
350 Carlos Chardón Street
San Juan, PR
Tel. 787-766-5656

**Defense Counsel (Appointed)**
Diego H. Alcala-Laboy
PO Box 12247
San Juan, PR
Tel. 787-432-4910
E-mail: dalcala@defensorialegal.com

**Prepared by:**          Milva Razetto
                                    U.S. Probation Officer
                                    U.S. Federal Bldg. & Courthouse
                                    150 Carlos Chardón Ave., Office 400
                                    San Juan, P.R.  00918-1741
                                    Tel. 787-281-1539
                                    E-mail: Milva_Razetto@prp.uscourts.gov

**Sentence Date:**          February 22, 2019

**Offense:**          <u>**Count 1**</u>:
                          21 U.S.C. §§ 841(a)(1), 846 and 860 - Conspiracy to possess with
                          the intent to distribute less than fifty (50) grams of cocaine.

                          <u>**Penalties:**</u>
                          A minimum term of one (1) to forty (40) years of imprisonment
                          and/or a $2,000,000 fine. A term of supervised release of at least
                          six (6) years. (Class B Felony)

**Count 6**:
18 U.S.C. § 924(c)(1)(A)(i) - Possession of a firearm in furtherance of a drug trafficking crime.
**Penalties:**
A minimum term of five (5) years to life imprisonment and/or a $250,000 fine. A term of supervised release of not more than five (5) years. (Class A Felony)

**Arrest Date:**          November 12, 2015

**Release Status:**       In custody since arrest

**Detainer:**             PR Department of Corrections

**Co-Defendants:**        [1] Edgardo Ramos-Vicente
                          [2] Jean Carlos Ramos-Vicente
                          [3] Ángel M. Meléndez-Mercado
                          [4] Héctor Luis Malavé-Guzmán
                          [5] Jean Carlos Vázquez
                          [6] Ismael Rivera-Torres
                          [7] Carlos J. Ríos-Santos
                          [8] Carlos Salvania-Bonilla
                          [9] Erick X. Vázquez-Vicente
                          [10] Jayson Vázquez-Vicente
                          [11] Francisco Xavier Vázquez-Alvarado
                          [12] Oscar Luis Mendoza-Flores
                          [13] Brian González
                          [14] John C. Suárez-Martínez
                          [15] Pedro L. Kuilan-Alvarez
                          [16] Víctor J. Veguilla-Martínez
                          [17] Víctor M. Rodríguez-Ayala
                          [18] Christian Reyes-Llera
                          [19] Juan C. Muller-Vázquez
                          [20] Jonathan Alvarado-Vega
                          [21] Gerardo Bonilla-Suárez
                          [22] José D. Suárez-Martínez
                          [23] Humberto Rivera-López
                          [24] Joseph Díaz-Morales
                          [25] Christian Rivera-Rivera
                          [26] Gerome Malavé-Guzmán
                          [27] Luis A. López-Torres
                          [28] Arnaldo Lleras-Corredor
                          [29] Edgardo Ramos-Meléndez
                          [30] Yeexsaira Malavé-Rodríguez
                          [31] Louis A. Pabón-Meléndez
                          [33] Mercedes Vega-Vázquez

**Date Report Prepared:** January 18, 2019          **Date Report Revised:**

**<u>Defendant Identifying Data:</u>**



| | |
|---|---|
| **Date of Birth:** | May 28, 1977 |
| **Age:** | 41 |
| **Race:** | White/Hispanic |
| **Sex:** | Male |
| **SSN#:** | 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 |
| **FBI#:** | 628646JC3 |
| **USM#:** | 46239-069 |
| **State ID#:** | PRIN 96002555 |
| **Other ID#:** | None known |
| **Education:** | GED |
| **Dependents:** | None |
| **Citizenship:** | United States |
| **Legal Address:** | Brisas de Cayey, Bldg. J Apt. 100<br>Cayey, Puerto Rico |
| **Alias:** | "Chava" |

*Restrictions on Use and Redisclosure of Presentence Investigation Report. Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.*

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1. The defendant, Carlos López-Meléndez, along with thirty-two other defendants, was the subject of a Six Count  Indictment rendered by a District of Puerto Rico Grand Jury on November 9, 2015. The defendant was charged in all counts, that is, conspiracy to possess with intent to distribute cocaine, marihuana, cocaine base and heroin; and possession of a firearm in furtherance of a drug trafficking crime.

2. Count One, the count of conviction, charges that beginning on a date unknown, but not later than in or about 2008, and continuing up to and until the return of this indictment on November 9, 2015, in the Municipality of Cayey, Puerto Rico, [1] Edgardo Ramos-Vicente, aka "Galdo", [2] Jean Carlos Ramos-Vicente, aka "Masimbo", [3] Angel M. Meléndez-Mercado, aka "Cachete", [4] Héctor Luis Malavé-Guzmán, aka "El Flaco", [5] Jean Carlos Vázquez, aka "Yankee", [6] Ismael Rivera-Torres, aka "Momo", [7] Carlos J. Ríos-Santos, aka "Charlie Ceja", "Cejon", Ceja, [8] Carlos Salvania-Bonilla, aka "Charlito", [9] Erick X. Vázquez-Vicente, aka "Erick Chino", [10] Jayson Vázquez-Vicente, aka "Simbad", [11] Francisco Xavier Vázquez-Alvarado, aka "Guacharito", [12] Oscar Luis Mendoza-Flores, aka "Luiggi", [13] Brian González, aka "Tetin", [14] John C. Suárez-Martínez, aka "Jota", [15] Pedro L. Kuilan-Alvarez, aka "Cafe", [16] Víctor J. Veguilla-Martínez, aka "Javier El Gordo", [17] Víctor M. Rodríguez-Ayala,  aka "Matatan", "Fosforito", [18] Christian Reyes-Llera, aka "Finqui", [19] Juan C. Muller-Vázquez, aka "Muller", [20] Jonathan Alvarado-Vega, aka "Transfor", [21] Gerardo Bonilla-Suárez, aka "El Vizco", [22] Jose  D. Suárez-Martínez, aka "Spider", [23] Humberto  Rivera-López, aka "Chono", [24] Joseph Díaz-Morales, aka "Joseph", [25] Christian Rivera-Rivera, aka "Alfalfa", El Dayo, [26] Gerome Malavé-Guzmán, aka "7 Pisos", [27] Luis A. López-Torres, aka "Pinguita", [28] Arnaldo Lleras-Corredor, aka "Chata", [29] Edgardo Ramos-Meléndez, aka "Galdito", [30] Yeexsaira Malavé-Rodríguez, aka "La China", [31] Louis A. Pabón-Melendez, aka "Bizcochón", **[32] Carlos J. López-Meléndez, aka "Chava",** [33] Mercedes Vega-Vázquez,  aka "Cede, Chichi", knowingly and intentionally combined, conspired and agreed with each other and others, to commit an offense against the United States, that is: to possess with the intent to distribute one (1) kilogram or more of a mixture or substance containing a detectable amount  of heroin, a Schedule I Narcotic Drug Controlled Substance; two-hundred and eighty (280) grams or more of a mixture or substance containing a detectable amount of cocaine base ("crack"), a Schedule II Narcotic Drug Controlled Substance; five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance; and a measurable amount of a mixture or substance containing a detectable amount of marijuana, a Schedule I Controlled Substance; a mixture or substance containing detectable amounts of Oxycodone (commonly known as Percocet), a Schedule II Controlled Substance; and a mixture or substance containing detectable amounts of Alprazolam (commonly known as Xanax), a Schedule IV Controlled Substance, all within one thousand (1,000) feet of the real property comprising a housing facility owned by a public housing authority, that is, Luis Muñoz Morales and Brisas de Cayey Public Housing Projects and other areas within the Municipality of Cayey, Puerto Rico including but not limited to San Tomás and Canteras Wards, in violation of Title 21, U.S.C., §§ 846, 841(a)(1) and 860.

3.    Counts Two through Five charged that, beginning on a date unknown, but not later than in or about 2008, and continuing up to and until the return of the indictment, that is November 9, 2015, in the Municipality of Cayey, Puerto Rico, [1] Edgardo Ramos-Vicente, aka "Galdo", [2] Jean Carlos Ramos-Vicente, aka "Masimbo", [3] Angel M. Meléndez-Mercado, aka "Cachete", [4] Héctor Luis Malavé-Guzmⵔán, aka "El Flaco", [5] Jean Carlos Vázquez, aka "Yankee", [6] Ismael Rivera-Torres, aka "Momo", [7] Carlos J. Ríos-Santos, aka "Charlie Ceja", "Cejon", Ceja, [8] Carlos Salvania-Bonilla, aka "Charlito", [9] Erick X. Vázquez-Vicente, aka "Erick Chino", [10] Jayson Vázquez-Vicente, aka "Simbad", [11] Francisco Xavier Vázquez-Alvarado, aka "Guacharito", [12] Oscar Luis Mendoza-Flores, aka "Luiggi", [13] Brian González, aka "Tetin", [14] John C. Suárez-Martínez, aka "Jota", [15] Pedro L. Kuilan-Alvarez, aka "Cafe", [16] Víctor J. Veguilla-Martínez, aka "Javier El Gordo", [17] Víctor M. Rodríguez-Ayala,  aka "Matatan", "Fosforito", [18] Christian Reyes-Llera, aka "Finqui", [19] Juan C. Muller-Vázquez, aka "Muller", [20] Jonathan Alvarado-Vega, aka "Transfor", [21] Gerardo Bonilla-Suárez, aka "El Vizco", [22] Jose  D. Suárez-Martínez, aka "Spider", [23] Humberto  Rivera-López, aka "Chono", [24] Joseph Díaz-Morales, aka "Joseph", [25] Christian Rivera-Rivera, aka "Alfalfa", El Dayo, [26] Gerome Malavé-Guzmán, aka "7 Pisos", [27] Luis A. López-Torres, aka "Pinguita", [28] Arnaldo Lleras-Corredor, aka "Chata", [29] Edgardo Ramos-Meléndez, aka "Galdito", [30] Yeexsaira Malavé-Rodríguez, aka "La China", [31] Louis A. Pabón-Melendez, aka "Bizcochón", **[32] Carlos J. López-Meléndez, aka "Chava",** [33] Mercedes Vega-Vázquez,  aka "Cede, Chichi",  aiding and abetting each other, knowingly  and intentionally possessed with  intent  to  distribute one (1) kilogram or more of a mixture or substance containing a detectable amount of heroin, a Schedule I Narcotic Drug Controlled Substance; two-hundred and eighty (280) grams or more of a mixture or substance containing a detectable amount of cocaine base ("crack"), a Schedule II Narcotic Drug Controlled Substance; five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance; and a measurable amount of a mixture or substance containing a detectable amount of marihuana, a Schedule I controlled substance, within one thousand (1,000) feet of the real property comprising a housing facility owned by a public housing authority, that is, Luis Muñoz Morales and Brisas de Cayey Public Housing Projects and other areas within and near the Municipality of Cayey, Puet1o Rico including but not limited to San Tomás and Canteras Wards, all in violation of Title 21, U.S.C. §§841(a)(1), (b)(1)(C), (b)(1)(D) & 860.

4.    Count Six, the count of conviction, charged that beginning on a date unknown, but not later than in or about 2008, and continuing up to and until the return of this indictment, that is November 9, 2015, in the Municipality of Cayey, Puerto Rico, defendants [1] Edgardo Ramos-Vicente, aka "Galdo", [2] Jean Carlos Ramos-Vicente, aka "Masimbo", [3] Angel M. Meléndez-Mercado, aka "Cachete", [4] Hector Luis Malavé-Guzmán, aka "El Flaco", [5] Jean Carlos Vázquez, aka "Yankee", [6] Ismael Rivera-Torres, aka "Momo", [7] Carlos J. Ríos-Santos, aka "Charlie Ceja", "Cejon", Ceja, [8] Carlos Salvania-Bonilla, aka "Charlito", [9] Erick X. Vázquez-Vicente, aka "Erick Chino", [10] Jayson Vázquez-Vicente, aka "Simbad", [11] Francisco Xavier Vázquez-Alvarado, aka "Guacharito", [12] Oscar Luis Mendoza-Flores, aka "Luiggi", [13] Brian González, aka "Tetin", [14] John C. Suárez-Martínez, aka "Jota", [15] Pedro L. Kuilan-Alvarez, aka "Cafe", [16] Víctor J. Veguilla-Martínez, aka "Javier El Gordo", [17] Víctor M. Rodríguez-Ayala,  aka "Matatan", "Fosforito", [18] Christian Reyes-Llera, aka "Finqui", [19] Juan C. Muller-Vázquez, aka "Muller", [20] Jonathan Alvarado-Vega, aka "Transfor", [21] Gerardo

5

Bonilla-Suárez, aka "El Vizco", [22] Jose D. Suárez-Martínez, aka "Spider", [23] Humberto Rivera-López, aka "Chono", [24] Joseph Díaz-Morales, aka "Joseph", [25] Christian Rivera-Rivera, aka "Alfalfa", El Dayo, [27] Luis A. López-Torres, aka "Pinguita", [28] Arnaldo Lleras-Corredor, aka "Chata", [29] Edgardo Ramos-Meléndez, aka "Galdito", [30] Yeexsaira Malavé-Rodríguez, aka "La China", [31] Louis A. Pabón-Meléndez, aka "Bizcochón", **[32] Carlos J. López-Meléndez, aka "Chava",** aiding and abetting each other, knowingly possessed firearms of different brands and calibers, in furtherance of a drug trafficking crime for which they may be prosecuted in a court of the United States, that is, conspiracy to possess with intent to distribute heroin, crack cocaine, cocaine & marihuana, in violation of Title 21, U.S.C., §841(a)(1) (as charged in Count One of the Indictment), all in violation of Title 18, U.S.C. §924(c)(1)(A)(i) and B(ii).

5.   *Narcotics Forfeiture*: Upon conviction of Counts One through Five, the defendants shall forfeit to the United States any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the instant offenses, and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the instant offense, pursuant to Title 21, U.S.C. §853(a)(1) and (2).

6.   *Firearms forfeiture*: Upon conviction of Count Six Indictment, the defendants shall forfeit to the United States any firearms and ammunition involved or used in the commission of the offense, pursuant to Title 18, U.S.C. § 924(d) and Title 28, U.S.C. § 2461(c).

7.   **On October 23, 2018, the defendant pled guilty to Counts One and Six of the Indictment, pursuant to the terms of a Plea Agreement accorded under the provisions of Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure**. The Plea Agreement contemplates the following guideline computations: The defendant is held accountable for less than fifty (50) grams of cocaine with a base offense level of twelve (12) pursuant to USSG §2D1.1(c)(14). As the offense took place within a protected location, two (2) levels are warranted pursuant to USSG §2D1.2(a)(1), establishing an adjusted base offense level of fourteen (14). As the defendant accepted responsibility for the offense, a two (2) level reduction applies pursuant to USSG §3E1.1(a), for a total offense level of twelve (12).

8.   As to Count One, the parties agreed to recommend a sentence of imprisonment within the range of 27 to 33 months. The parties further agreed that the state's criminal cases GSC2014G0097 and GSC2014G0098 are relevant conduct to the offense charged in Count One of Cr. No. 15-696(PAD). The parties did not stipulate as to a Criminal History Category. As to Count Six, the parties recommended a sentence of imprisonment of 60 months, to be served consecutively with the term of imprisonment to be imposed in Count One. The defendant knowingly and voluntarily agreed that, if the sentence imposed by the Court is 97 months or less, the defendant waives the right to appeal any aspect of this case's judgment and sentence, including but not limited to the term of imprisonment or probation, restitution, fines, forfeiture, and the term and conditions of supervised release.

**Co-defendant Status**:

9.   All co-defendants are either in plea negotiations, have pled guilty, and are awaiting sentencing or are pending trial.

**Related Cases**

10. None known.

**The Offense Conduct[1]**

11. **According to the available information**, the object of the conspiracy was to distribute controlled substances at Luis Muñoz Morales and Brisas de Cayey Public Housing Projects, Cantera and San Tomás wards, and other areas within the Municipality of Cayey, Puerto Rico, for significant financial gain and profit.

12. The drug trafficking organization would control the drug distribution business in Luis Muñoz Morales and Brisas de Cayey Public Housing Projects, Cantera and San Tomás Wards, located in the Municipality of Cayey, Puerto Rico.

13. The drug trafficking organization conducted transactions and engaged in actions to further their drug trafficking activities in different municipalities of Puerto Rico.

14. Some of the defendants and co-conspirators coordinated the drug trafficking activities using cellular phones, used apartments at Luis Muñoz Morales and Brisas de Cayey Public Housing Projects, and other dwellings outside the housing projects as "stash houses" to store firearms, ammunition, controlled substances and drug paraphernalia, conducted drug transactions and other activities related to the drug trafficking business including weighing, decking, mixing and preparing drugs for further distribution.

15. According to the investigation some of the defendants and co-conspirators evicted residents from their apartments by force, to use those apartments for use by co-conspirators.

16. Members of the drug trafficking organization and co-conspirators installed barriers to limit the free access to the housing project and impede law enforcement interventions.

17. The defendants and co-conspirators purchased wholesale quantities of heroin, cocaine and marijuana in order to distribute the same in street quantity amounts at their drug distribution points within the Municipality of Cayey and other areas of Puerto Rico.

18. The defendants and co-conspirators maintained a group of defendants administrating the day to day activities of the drug distribution points.

19. Some of the cocaine purchased at wholesale prices was "cooked" to make cocaine base ("crack"), for distribution at the drug distribution points.

20. The defendants and co-conspirators routinely placed the controlled substances in distinctive "baggies", vials or packaging, using specific seals ("sellos"), colors or stickers to identify and maintain control of the drugs distributed at the drug distribution points.

---

[1] Pursuant to the mandates issued by the Probation and Pretrial Services Division of the Administrative Office of the United States Courts, the Offense Conduct in the Presentence Report is not necessarily limited to the facts agreed to by the parties in a plea agreement or stipulation.  Publication 107, Chapter III, Pg. 13.

21.     The leaders of the organization divided amongst themselves and their subordinates the proceeds of the drug trafficking sales. The "drug owners" often received proceeds from the sale of specific controlled substances.

22.     The defendants and co-conspirators used different locations to package and conceal the heroin, cocaine base ("crack"), cocaine, marijuana, equipment and drug paraphernalia to process and package the controlled substances.

23.     The defendants and co-conspirators used force, violence, and intimidation to gain and maintain control of their drug points and to intimidate rival drug trafficking organizations and expand their drug trafficking activities.

24.     The investigation revealed that members of the drug trafficking conspiracy intimidated residents of Luis Muñoz Morales and Brisas de Cayey Public Housing Projects to control the locations used for their drug distribution business.

25.     The defendants and co-conspirators routinely possessed, carried, brandished and used firearms of different brands and calibers, including fully automatic firearms, to protect themselves, their drug trafficking organization, maintain control of their drug points, intimidate and retaliate against other drug trafficking organizations and in furtherance of their drug trafficking activities.

26.     The defendants and co-conspirators acted in different roles to further the goals of the conspiracy. The organization constituted of leaders, managers or drug owners, enforcers, runners, drug processors, facilitators, sellers, and lookouts.

27.     The defendants and co-conspirators allowed customers to consume controlled substances within the drug point areas and conducted drug transactions in the presence of minors.

28.     The defendants and co-conspirators used two-way radios (walkie-talkies) to communicate amongst themselves to alert the presence of law enforcement agents or members of rival gangs.

29.     The investigation revealed that the defendants and co-conspirators used cellular phones to communicate amongst themselves and in furtherance of their drug trafficking activities. They would take pictures of themselves in possession of firearms, and of the drugs that they distributed. They used social media to post pictures of co-conspirators in possession of firearms, to promote their drug trafficking activities, and to threaten witnesses.

30.     The defendants and co-conspirators used vehicles registered under other persons' name to commit acts in furtherance of their drug trafficking activities.

31.     The defendants and co-conspirators used and employed juveniles, that is, persons under the age of eighteen, to distribute narcotics at the drug distribution points.

32.     The defendants and co-conspirators routinely used code names to refer to the different narcotics sold at the drug distribution points in efforts to conceal the drug trafficking activities from other persons not related to the business.

33.   The defendants and co-conspirators kept "tally sheets" to account for the narcotics sold and had different letters and code names to refer to the different types of narcotics sold and to identify the people who sold them, as a way to conceal from persons not associated with the organization, the real meaning and purpose of the document.

34.   The defendants and co-conspirators, prepared work schedules which established different shifts for sellers, to organize the drug selling operations at the drug distribution point.

35.   Some leaders, runners, sellers and facilitators at times acted as enforcers, possessing, carrying, brandishing, using and discharging firearms to protect the members of the drug trafficking organization, the narcotics, the proceeds from their sales, and to further accomplish the goals of the conspiracy.

*A. Leaders*

36.   The leaders directly controlled, supervised and had decisional power over the drug trafficking operations at the drug distribution points. During the span of the conspiracy, the leaders purchased multi-kilogram quantities of narcotics, coordinated, and oversaw the transportation and sale of such narcotics by their subordinates at the different drug distribution points. The leaders were owners of different controlled substances distributed at the drug points and also received proceeds from the sale of controlled substances owned by other co-conspirators, and/or received "rent" payments for the right to sell those controlled substances at the places under the control of the organization.

37.   Throughout the conspiracy the leaders provided firearms, instructed and allowed members of the conspiracy to carry them to protect the drug distribution business, during and in furtherance of their drug trafficking activities. In addition the leaders had to be consulted and had the final word in allowing a controlled substance to be introduced at the drug points or a person to be hired to work with the organization.

38.   The leaders also met with other members of the organization and with other persons to establish and coordinate the manner and means of conducting their drug trafficking activities. They also had co-conspirators under their command in charge of controlling the daily drug trafficking activities on their behalf to avoid exposure. The leader also ordered and authorized other co-conspirators to carry out acts of violence in furtherance of the drug trafficking operation.

*B. Managers/Drug Owners*

39.   The managers, also referred as drug owners directly supervised the drug distribution activities at the various drug distribution points. They received proceeds from the sale of controlled substances distributed at the various drug distribution points. They routinely placed their drugs in distinctive colored (labels, stickers, seals) baggies in order to keep track of the drugs sold at the drug trafficking organization's drug distribution points.

*C. Enforcers*

40.   The enforcers possessed, carried, brandished, and discharged firearms to protect the leaders, drug owners, other members of the organization, the operation of the drug trafficking business, the narcotics, and the proceeds derived from the sales of the narcotics.

They also threatened and intimidated others in order to facilitate and accomplish the object of the conspiracy. At various times during the conspiracy, some enforcers were ordered by the leaders to carry out acts of violence on behalf of the organization.

### D. Drug Processors

41.    The drug processors met in different locations to cook the cocaine to convert it into cocaine base "crack" for distribution at the drug points. They were also in charge of the process known as "decking", receiving wholesale amounts of drugs for packaging for retail distribution sales at the drug points.

### E. Runners

42.    The runners worked under the direct supervision of the leader of the drug trafficking organization and or "drug owners". They were responsible for providing sufficient narcotics to the sellers for distribution at the drug point. They were also responsible for distributing wholesale amounts of controlled substances to other co-conspirators and collected the proceeds on behalf of the leaders and drug owners. Some of the runners were in charge of supplying cocaine to other co-conspirators for cooking and distribution as "crack" at the drug points controlled by the organization or the drug points they supplied.

43.    The runners were also responsible for collecting the proceeds of drug sales and paying the street sellers. They also supervised and made sure that there were street sellers for every shift at the drug points. They made schedules and prepared ledgers to maintain accountability of the sales of the narcotics sold at the drug point. At various times, they were responsible for recruiting street sellers and additional runners. The runners also supervised the sellers and the daily activities at the drug point. At some time point during the span of the conspiracy, some runners also acted as sellers for the drug trafficking organization.

### F. Sellers

44.    The sellers distributed wholesale amounts of cocaine, heroin, marihuana and "crack" cocaine to other co-conspirators for further distribution at the organization's drug points and drug points belonging to other drug trafficking organizations. The sellers also distributed street quantity amounts of heroin, "crack" cocaine, cocaine and marijuana, and were held accountable to the runners for the drug proceeds and the narcotics sold at the drug distribution points. At times, some sellers used two-way radios ("walkie-talkies") in order to communicate with other members of the conspiracy.

### G. Facilitators

45.    The facilitators performed different tasks on behalf of the drug trafficking organization including such as stashing firearms, drugs, proceeds, paraphernalia and other objects related to the drug trafficking business. They also allowed the use of their residences by the drug trafficking organization and served as messengers and intermediaries in drug transactions for other members of the conspiracy.

*H. Lookouts*

46.     The lookouts conducted surveillance at strategic locations within and around the drug points controlled by the organization. Their task consisted in detecting the presence of law enforcement personnel and members of rival gangs. At times they would use two-way radios ("walkie-talkies") in order to communicate their observations to other members of the drug trafficking organization.

47.     On June 5, 2017, the lead Probation Officers contacted the HSI Special Agent in charge of the case to discuss the drug amounts sold during the span of the drug trafficking conspiracy.

| Controlled Substances Quantities From 2008 until 2015[2] | | | |
|---|---|---|---|
| **Controlled Substance** | **Daily Amounts** | **Weekly Amounts** | **Yearly Amounts[3]** |
| **Heroin $5.00** | **8.48 grams** | **59.36 grams** | **3.1 kilograms** |
| **Crack Cocaine $7.00** | **52.8 grams** | **369.6 grams** | **19.2 kilograms** |
| **Cocaine $3.00 $5.00 $10.00 $20.00** | **32.34 grams** | **226.3 grams** | **11.8 kilograms** |
| **Marihuana $7.00 $12.00** | **None provided** | **None provided** | **None provided** |

48.     According to the investigation and the information received from the Special Agent in charge of the case, the organization was violent in nature and participated in shootings in order to gain control of the various drug selling points in Cayey, PR. All of the defendants in the conspiracy except for [33] Mercedes Vega-Vázquez possessed firearms in furtherance of the drug trafficking conspiracy.

49.     **According to the Stipulation of Facts,** beginning on a date unknown, but not later than in or about 2008, and continuing up to and until the return of this indictment, in the Municipality of Cayey, PR, in the District of Puerto Rico, elsewhere, and within the jurisdiction of this Court, the defendant and others, did knowingly and intentionally conspire to possess with the intent to distribute 1 kilogram or more of heroin; 280 grams or more of cocaine base ("crack"); 5 kilograms or more of cocaine; a measurable amount marijuana; detectable amounts of Oxycodone (commonly known as Percocet); and detectable amounts of Alprazolam (commonly known as Xanax); all within 1,000 feet of the real property comprising a housing facility owned by a public housing authority, that is, Luis Muñoz Morales and Brisas de Cayey Public Housing Projects and other areas

---

[2] Amounts provided by the HSI Special Agent.
[3] Yearly amount calculated by multiplying weekly drug amount times fifty-two weeks.

within and near the Municipality of Cayey, Puerto Rico including but not limited to San Tomás and Canteras Wards;  all in violation of 21 U.S. Code, §§ 846, 84l(a)(1)(b)(1)(A) and 860. Beginning on a date unknown, but not later than in or about 2008, and continuing up to and until the return of the Indictment, in the Municipality of Cayey, in the District of Puerto Rico; elsewhere, and within the jurisdiction of this Court, the defendant and others, aiding and abetting each other, did knowingly possess firearms of different brands and calibers, in furtherance of a drug trafficking crime for which they may be prosecuted in a court of the United States, that is, conspiracy to possess with intent to distribute heroin, crack cocaine, cocaine and marihuana.

50.     The defendant admitted he was a seller, lookout and facilitator for the drug trafficking organization. As a seller, he distributed street quantity amounts of heroin, crack cocaine, cocaine and marijuana, at the drug distribution point in Brisas de Cayey Public Housing Project. As a lookout, he conducted surveillance at strategic locations within and around the drug points controlled by the organization. His task was to detect the presence of law enforcement personnel and members of rival gangs, and to inform their presence to other members of the conspiracy. As a facilitator, he stashed drugs and firearms of different brands and calibers that were used to protect the drug trafficking activities.

51.     Although multi-kilogram amounts of the controlled substances were sold during the conspiracy, for purposes of the plea agreement the defendant admitted that he conspired to possess with intent to distribute less than 50 grams of cocaine, to yield a base offense level of 12.

52.     Carlos López-Meléndez was arrested on November 12, 2015, and was brought before U.S. Magistrate Judge Camille L. Vélez-Rivé for Initial Appearance. He was temporarily detained.

53.     On December 1, 2015, at the Bail Hearing, the Court ordered the defendant to remain detained pending further proceedings.

54.     As per Bureau of Prisons records, the defendant has a disciplinary action taken for phone abuse/disrupt monitoring on April 2, 2107. He was sanctioned with six months' loss of phone privileges. Currently, he has no work assignments, but previously worked as a unit orderly. He also appears to have completed his GED and is proficient in English as a second language.

### Victim Impact

55.     There are no identifiable victims in this case.

### Adjustment for Obstruction of Justice

56.     The probation officer has no information indicating the defendant impeded or obstructed justice.

### Acceptance of Responsibility:

57.     On January 11, 2019, the defendant was interviewed at the U.S. Marshal cellblock located at the U.S. Courthouse in San Juan, PR, in the presence of counsel. At the time, the

defendant accepted responsibility for the instant offense as per the plea agreement and is repentant of his conduct. He further stated that because of his circumstances, having searched for employment and not finding any because of his prior criminal history, led him to participate in the instant offense. While under custody, he would like to take advantage of all the vocational courses offered. Once released, he would like to use those skills to move on with life, spend time with his mother, seek legal employment and fully comply with his conditions of supervised release imposed.

### Offense Level Computation

58.     The 2018 Guidelines Manual, incorporating all guideline amendments, was used to determine the defendant's offense level. USSG §1B1.11.

   **Count 1**: **Conspiracy to possess with the intent to distribute less than fifty (50) grams of cocaine.**

59.     **Base Offense Level:** The guideline for a violation of 21 U.S.C. § 860 is USSG §2D1.2. Pursuant to §2D1.2(a)(1), §2D1.1(c)(14) is referenced when determining the offense level, which provides a base offense level of twelve. As the offense took place in a protected location, two levels are added for a base offense level of fourteen. USSG §2D1.2(a)(1) and §2D1.1(a)(5).     **14**

60.     **Specific Offense Characteristics:** None.     **0**

61.     **Victim Related Adjustment:** None.     **0**

62.     **Adjustment for Role in the Offense:** None.     **0**

63.     **Adjustment for Obstruction of Justice:** None.     **0**

64.     **Adjusted Offense Level (Subtotal): Fourteen**     **14**

65.     **Specific Offense Characteristics:** None.     **0**

66.     **Victim Related Adjustment:** None.     **0**

67.     **Adjustment for Role in the Offense:** None.     **0**

68.     **Adjustment for Obstruction of Justice:** None.     **0**

69.     **Chapter Four Enhancement:** The defendant was at least 18 years old at the time of the instant offense of conviction; the instant offense of conviction is a felony that is a controlled substance offense; and the defendant has at least two prior felony convictions of a crime of violence; therefore, the defendant is a career offender. The offense level for a career offender is 37, as the maximum statutory penalty is life. USSG §4B1.1.     **37**

70.     **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a).     **-2**

71. **Acceptance of Responsibility:** The defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. USSG §3E1.1(b).                                    **-1**

72. **Total Offense Level: Thirty-four**                                                                        **34**

   **Count 6: Possession of a firearm in furtherance of a drug trafficking crime.**

73. **Base Offense Level:** The guideline for a violation of 18 U.S.C. § 924(c)(1)(A)(i) is USSG §2K2.4. The guideline sentence is the term of imprisonment required by statute. Chapters Three (Adjustments) and Four (Criminal History and Criminal Livelihood) shall not apply to this count of conviction. USSG §2K2.4(b).

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

74. According to the National Crime Information Center (NCIC) and the local record check (RCCV), the defendant has the following arrests and convictions:

   **Juvenile Adjudication(s)**

75. None known.

   **Adult Criminal Conviction(s)**

|  | **Date of Arrest** | **Conviction/Court** | **Date Sentence Imposed/Disposition** | **Guideline** | **Pts** |
|---|---|---|---|---|---|
| 76. | 12/27/1995 (Age 18) | PR Penal Code (1974) Art. 173: Robbery Cr. No. GPD1996G0040 Art. 235: Contempt Cr. No. GDS96M0146 Guayama Superior Court, Guayama, PR | 01/30/1997: Found guilty by a jury. Sentenced to thirteen (13) years of imprisonment as to Art. 173, to be served consecutively with any other sentence and three (3) months as to the contempt, to be served consecutively. The defendant served in prison up to February 6, 1998. 2/6/1998: Twelve (12) year and three (3) month sentence was | 4A1.1(a) | 3[4] |

---

[4] COV used for career offender predicate offense and calculations pursuant to USSG §4A1.2 and Supreme Court decision in Stokeling v. U.S., 586 U.S. _ (2019).

suspended.

7/13/1998: Revoked.

As per the charging documents, on December 25, 1995 in Cayey, PR, the defendant illegally, voluntarily, maliciously and with criminal intent, by violence and intimidation, illegally appropriated of a Fila watch valued at $45, that belonged to J.M.C., from his immediate presence and against his will. The defendant was represented by counsel.

| | | | | | |
|---|---|---|---|---|---|
| 77. | 04/13/1998 (Age 20) | PR Penal Code (1974) Art. 173: Robbery re-classified to Art. 166: Attempted Aggravated Illegal Appropriation Cr. No. GPD1998G0227 Guayama Superior Court, Guayama, PR | 07/13/1998: Sentenced to three (3) years of imprisonment, to be served consecutively with any other sentence. 8/26/1998:0Sentence previously imposed on 2/6/1998 was revoked because of this new criminal conduct. | 4A1.1(a) | 3 |

As per the charging documents, on April 4, 1998, in Cayey, PR, the defendant aiding and abetting another, illegally, voluntarily, maliciously and with criminal intent, by means of violence and intimidation, illegally appropriated of a 14k chain and a Virgin Mary medallion, valued at $730 from victim's immediate presence and against his will. The defendant was represented by counsel.

| | | | | | |
|---|---|---|---|---|---|
| 78. | 04/27/2005 (Age 27) | PR Penal Code (2004) Art. 173: Attempted Robbery Cr. No. GPD2005G0196 Cr. No. GPD2005G0197 Art. 173: Robbery Cr. No. GPD2005G0198 PR Weapons Law 404 Art. 5.05: Possession and use of a bladed weapon Cr. No. GLA2005G0107 | 08/08/2005: As to Cr. No. GPD2005G0196-197, he was sentenced to four (4) years of imprisonment as to each count, to be served concurrently. As to Cr. No. GPD2005G0198, he was sentenced to eight (8) years of imprisonment, to be served concurrently. As to Cr. No. GLA2005G0107, he was sentenced to one (1) year of imprisonment to | 4A1.1(a) 4A1.1(e) 4A1.2(a)(2)(B) | 4[5] |

_____

[5] COV used for career offender predicate offense and calculations pursuant to USSG §4A1.2 and Stokeling v. U.S., 586 U.S. _ (2019).

| | | PR Weapons Law 404 Art. 5.04: Possession a weapon without a license Cr. No. GLA2005G0108 Guayama Superior Court, Guayama, PR | be served consecutively. As to Cr. No. GLA2005G0108, he was sentenced to one (1) year of imprisonment to be served consecutively. | | |

As per the charging documents, on April 21, 2005, in Cayey, PR, the defendant illegally, voluntarily, maliciously, and with criminal intent, by means of violence and intimidation, attempted to illegally appropriate a gold chain that belonged to C.J.G. in his immediate presence and against his will, while showing the victim a hypodermic needle filled with blood. The defendant was represented by counsel.

As per the charging documents, on April 25, 2005, in Cayey, PR, the defendant illegally, voluntarily, maliciously, and with criminal intent, by means of violence and intimidation, attempted to illegally appropriate a gold chain that belonged to V.R.A. in his immediate presence and against his will while in possession of a firearm. He further stated to the victim to carefully take off the jewelry and hand it, that he had spent fifteen years in prison. The defendant was represented by counsel.

As per the charging documents, on April 26, 2005, in Cayey, PR, the defendant illegally, voluntarily, maliciously, and with criminal intent, by means of violence and intimidation, while possessing a firearm, illegally appropriated of a gold chain and a gold ring with an incrusted diamond, valued from $300 to $400 from the immediate presence of S.A.M.O. and against his will. The defendant was represented by counsel.

| 79. | 04/11/2008 (Age 30) | PR Penal Code Art. 252: Obstruction of public authority Cr. Nos. LOP2008M0014 to LOP2008M0015 PR Penal Code Art. 121: Assault Cr. Nos. LCR2008M0166 and LIC2008M0007 Utuado Superior Court, Utuado, PR | 06/09/2008: Sentenced to sixty (60) days of imprisonment as to each count, to be served concurrently with each other and consecutive to any other. | 4A1.1(b) | 2 |

As per the charging documents, on February 7, 2008, at Penal Camp La Pica in Jayuya, PR, the defendant aiding and abetting others, illegally, voluntarily, maliciously and with criminal intent, assaulted and injured Penal Officer H.L.A. and Custodial Agent A.M.L.Q. by punching them in the face, body and genitals so that they would be unable to search

16

someone. As per the defendant's account this was a prison riot. The defendant was represented by counsel.

| 80. | 04/08/2011 (Age 33) | PR Weapons Law Art. 5.06: Possession of a firearm without a license Cr. No. GLA2011G0121 | 07/14/2011: As to Cr. No. GLA2011G0121, sentenced to one (1) year of imprisonment. | 4A1.1(a) | 3 |
|---|---|---|---|---|---|
| | | PR Penal Code (2004) Art. 198: Robbery Cr. No. GBD2011G0140 | As to Cr. No. GBD2011G0140, sentenced to three (3) years and one (1) day of imprisonment. | | |
| | | Guayama Superior Court, Guayama, PR | Both to be served consecutively with each other and to any other. | | |

As per the charging documents, on April 8, 2011, in Cayey, PR, the defendant illegally, voluntarily, maliciously and with criminal intent, by means of violence or intimidation, and illegally appropriated of $10 and an AT&T cellular phone belonging to minor B.O.R. by means of intimidation while brandishing a black and silver firearm. The defendant was represented by counsel.

| 81. | 12/12/2014 (Age 37) | PR Controlled Substances Law Art. 401: Distribution re-classified to Art. 404: Possession Cr. Nos. GSC2014G0297 and GSC2014G0298 | 02/19/2015: As to Cr. Nos. GSC2014G0297 and GSC2014G0298, sentenced to three (3) years of imprisonment. As to Cr. No. G1CR201500028, sentenced to six (6) months of imprisonment. | 4A1.1(a)(1) 4A1.2(a)(2)(B) | 3 |
|---|---|---|---|---|---|
| | | Art. 177: Threats (misdemeanor) Cr. No. G1CR201500028 | As to Cr. No. GLA2015G0029, sentenced to two (2) years of imprisonment. | | |
| | | PR Weapons Law 404 Art. 5.04: Possession of a Firearm (Pneumatic modality) Cr. No. GLA2015G0029 | As to Cr. No. GLA2015G0030, sentenced to six (6) months and one (1) day of imprisonment. | | |
| | | PR Weapons Law 404 Art. 5.05: Possession and use of a knife/ | As to Cr. Nos. GBD2015G0034 and | | |

| | |
|---|---|
| bladed weapon Cr. No. GLA2015G0030 | GBD2015G0035, sentenced to three (3) years of imprisonment. |
| PR Penal Code (2012) Arts. 189 and 190.E: Robbery and Aggravated Robbery re-classified to Art. 182: Aggravated Illegal Appropriation, 3rd degree modality Cr. No. GBD2015G0034 and GBD2015G0035 | All weapons violations to be served consecutively with each other and with the other sentences imposed, for a total of five (5) years, six (6) months and one (1) day of imprisonment. |
| Guayama Superior Court, Guayama, PR | |

As per the charging documents, on July 28, 2014, in Cayey, PR, the defendant illegally, voluntarily, maliciously and with criminal intent, illegally distributed heroin and cocaine.

As per the charging documents, on October 2, 2014, in Cayey, PR, the defendant illegally, voluntarily, maliciously and with criminal intent, by means of violence or intimidation, illegally appropriated of two 19k gold matrimonial rings with a value of $620 each, which belonged to victim G.G.B in his immediate presence and against his will.

As per the charging documents, on October 7, 2014, in Cayey, PR, the defendant illegally, voluntarily, maliciously and with criminal intent, by means of violence or intimidation, and while in possession of a firearm, illegally appropriated of a cellular phone and $33 in cash belonging to E.F.G.L in his immediate presence and against his will. The defendant was represented by counsel.

**Criminal History Computation**

82.   The criminal convictions above result in a subtotal criminal history score of 17.

83.   According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of 17 establishes a criminal history category of VI.

84.   The defendant is a career offender; therefore, the criminal history category is VI. USSG §4B1.1(b).

**Other Criminal Conduct**

85.   None known.

**Pending Charges**

86.   None known.

**Other Arrests**

87.     None known.

## PART C. OFFENDER CHARACTERISTICS

**Family Ties, Family Responsibilities, and Community Ties**

88.     As verified through the Puerto Rico Demographic Registry database, Carlos Manuel López-Meléndez was born on May 28, 1977 in Caguas, PR. His parents are Héctor Manuel López-Irizarry, whereabouts unknown and Lydia Esther Meléndez-Ortíz, a homemaker. He has two siblings who were identified as María Mercedes, age 38, a homemaker and resident of Brisas de Cayey PHP and José Oscar, age 35, who works in construction and resides in the Caimito Ward, Guaynabo, PR. The defendant also reported having three maternal siblings named Magda Celeste López-Meléndez, age 46, who works at the Cayey Municipality and resides at the Toita Ward; Luis Angel Reyes, age 33, a resident of Carolina, PR; and Karla Michelle Reyes-Meléndez, age 30, resident of Brisas de Cayey PHP.

89.     As reported, the defendant had a good upbringing even though his parents separated when he was three years old. He has had no contact with his father since then.  His mother raised him and instilled good values and discipline.  She also provided for his basic needs. When the defendant was ten years old, Mr. Luis Angel Reyes, a mechanic, commenced a relationship with his mother. The defendant expressed that both him and his biological father were alcoholics and abusive towards his mother. He advised having interfered in multiple instances to protect his mother from his abusive step-father. The authorities were called several times, but his mother never filed charges against his consensual partners because she forgave them. They would just temporarily leave the home. The defendant did not report a history of abuse or neglect towards him. Also, no family members suffer from mental health conditions or drug use. He is not the first in his family to interface with the legal system as both brothers, Luis Angel and José Oscar have served time at the federal level and are currently serving supervised release terms in Cr. No. 12-737, defendants #21 and #22 respectively.

90.     Regarding residential history, the defendant has been a lifelong resident of Cayey, PR. He reported having resided with his mother at Brisas de Cayey PHP, Building J, Apt. 100.

91.     The defendant is single. He reported having been in a consensual relationship with Vilmarie Carrasquillo for two years. They procreated Jean Carlos, age 23, who is also imprisoned. The defendant stated that he left his partner, to serve a state prison term, while she was pregnant, and Mrs. Carrasquillo raised the child on her own.

92.     The defendant is Catholic. In his free time, he enjoys listening to music, drawing and watching movies.

93.     The defendant did not report having friends or family members involved in the instant offense. He reported not being affiliated with any gangs at this time. Nonetheless, he

belonged to the "27" gang while in state prison. He reported having no friends. His mother is everything to him.

94.  The defendant's personal information was verified through supporting documents as the defendant could not provide any contact numbers for family members. He keeps in contact with his mother via mail.

## Physical Condition

95.  The defendant is a white/ Hispanic male who is 5'8", weighs 142 lbs., has brown eyes, and grey hair.  He has eyebrow tattoos and other tattoos in both arms, right leg and back. He did not report having scars.

96.  The defendant is overall healthy. Nonetheless, he suffers from Hepatitis C for which he received treatment over ten years ago, while in a state facility. He is not allergic to food items or medication.

## Mental and Emotional Health

97.  The defendant has no history of mental or emotional problems, and no history of treatment for such problems.

## Substance Abuse

98.  The defendant reported the use of controlled substances since age fifteen. He reported smoking marihuana from age fifteen until age seventeen. He smoked with his peers two or three times per day. At age seventeen until age nineteen, the defendant consumed two or three baggies of cocaine, during the weekends. From age eighteen to nineteen, while discontinuing the use of other drugs, he started inhaling and later injecting heroin, daily. Sometimes, the defendant consumed speedball, the mix of cocaine and heroin. The defendant reported a history of substance abuse treatment at the state level.  He reported receiving counseling twice a week for five months at the Guayama Correctional Facility. The defendant reported he is free of drug use since his instant arrest. The defendant did not report alcohol consumption.

99.  On November 12, 2015, the defendant exercised his right and declined to provide a sample for drug testing.

## Educational, Vocational and Special Skills

100.  The defendant completed up to the 10th grade at Miguel Meléndez Muñoz High School in Cayey, PR. He discontinued his studies because he was arrested. The defendant reported completing his GED during 1999 while serving a state term at the Ponce Mil Facility in Ponce, PR. The defendant stated he was never suspended, expelled or participated of special education. He would like to further his skills as a barber, electrician, baker and construction worker by taking vocational courses offered at the prison facility. The defendant is a Spanish language speaker with knowledge of the English language.

## Employment Record

101.  The defendant has not been formally employed. He reported that he has spent most of his time imprisoned.

**Financial Condition: Ability to Pay**

102.  According to the defendant, he has no assets or liabilities. He receives approximately $18 a month for his work at the detention center.

103.  An Equifax Credit Report revealed no credit history for this defendant.

104.  Verification of the P.R. Child Support Enforcement Administration (ASUME) database revealed no case with said agency.

105.  Verification of the P.R. Municipal Revenue Collection Center (CRIM) database revealed no property registered to the defendant.

106.  Verification of the P.R. Department of Transportation and Public Works Registry (DAVID) database revealed no registered license or vehicles for the defendant.

107.  Verification of the P.R. Weapons Registry, there are no firearms or permit records for this defendant.

108.  Based upon the defendant's financial profile, it appears that he does not have the ability to pay a fine within the advisory guideline range. If the Court after review of the financial disclosure makes a finding that the imposition of a fine within the required range is not viable, the Court may impose a lesser fine or waive the imposition of the same. USSG §5E1.2 (e).

## PART D. SENTENCING OPTIONS

### Custody

109.  **Statutory Provisions:** Count 1: The maximum term of imprisonment is forty (40) years, there a one (1) year minimum term of imprisonment. 21 U.S.C. § 841(b)(1)(C), 846 and 860. Count 6: The minimum term of imprisonment is five years and the maximum term is life. 18 U.S.C. § 924(c)(1)(A)(i).

110.  The term of imprisonment on Count 6 must be imposed consecutively to any other counts.

111.  **Guideline Provisions:** Based upon a total offense level of 34 and a criminal history category of VI, the guideline imprisonment range is 262 to 327 months.

112.  As the applicable guideline range falls in Zone D of the Chapter 5 Sentencing Table, the guidelines require that the minimum term be served by imprisonment. USSG § 5C1.1(f).

### Supervised Release

113.  **Statutory Provisions:** Count 1: The Court must impose a term of supervised release of at least six years. 21 U.S.C. § 841(b)(1)(C) and 860. Count 6: The Court may impose a term of supervised release of not more than five years. 18 U.S.C. § 3583(b)(1).

114.     Multiple terms of supervised release shall run concurrently. 18 U.S.C. § 3624(e).

115.     **Guideline Provisions:** Count 1: The guideline range for a term of supervised release is at least six years. USSG §5D1.2(c). Count 6: Since the offense is a Class A Felony, the guideline range for a term of supervised release is 2 to 5 years. USSG §5D1.2(a)(1).

#### Probation

116.     **Statutory Provisions:** Count 1: The defendant is ineligible for probation because the offense is a Class B Felony, pursuant to Title 18, U.S.C. § 3561(a)(1). Count 6: The defendant is ineligible for probation because the offense is a Class A Felony, pursuant to Title 18, U.S.C. § 3561(a)(1).

117.     **Guideline Provisions:** Count 1: The defendant is ineligible for probation because the offense is a Class B Felony. USSG §5B1.1(b)(1). Count 6: The defendant is ineligible for probation because the offense is a Class A Felony. USSG §5B1.1(b)(1).

#### Fines

118.     **Statutory Provisions:** Count 1: The maximum fine is $2,000,000. 21 U.S.C. § 841(b)(1)(C) and 860. Count 6: The maximum fine is $250,000. 18 U.S.C. § 3571(b).

119.     Counts 1 and 6: A special assessment of $100 at to each count, for a total of $200, is mandatory. 18 U.S.C. § 3013.

120.     **Guideline Provisions:** The fine range for this offense is $35,000 to $2,000,000. If the defendant is convicted under a statute authorizing (A) a maximum fine greater than $500,000, or (B) a fine for each day of violation, the Court may impose a fine up to the maximum authorized by the statute. USSG §§5E1.2(c)(3) and (c)(4).

121.     Costs of prosecution shall be imposed on the defendant as required by statute. USSG §5E1.5. In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed. USSG §5E1.2(d)(7) and Title 18, U.S.C. § 3572(a)(6). These costs may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs. The most recent advisory from the Administrative Office of the United States Courts, dated August 1, 2018, provides the following monthly cost data:

|  | **Bureau of Prisons Facilities** | **Community Correction Centers** | **Supervision by Probation Officer** |
|---|---|---|---|
| Daily | $99.00 | $89.00 | $12.00 |
| Monthly | $3,025.00 | $2,692.00 | $364.00 |
| Annually | $36,300 | $32,309.00 | $4,369.00 |

#### Restitution

122.     **Statutory Provisions:** Pursuant to 18 U.S.C. § 3663(a)(1)(A), discretionary restitution may be ordered in this case.

123. **Guideline Provisions:** Restitution may be ordered in this case. USSG §5E1.1.

   **Denial of Federal Benefits**

124. **Statutory Provisions:** At the discretion of the Court, the defendant, having been convicted of a second drug distribution offense, shall be ineligible for all federal benefits for up to 10 years after such conviction, pursuant to Title 21, U.S.C. § 862(a)(1)(B).

125. **Guideline Provisions:** The Court, pursuant to 21 U.S.C. § 862, may deny the eligibility for certain federal benefits of any individual convicted of distribution or possession of a controlled substance. USSG §5F1.6.

   **Impact of the Plea Agreement**:

126. By pleading guilty, the defendant benefitted from a two-level reduction for acceptance of responsibility and the dismissal of the remaining counts. In absence of the plea agreement, he could have been exposed to up to a forty-year term of imprisonment as to Count One and life imprisonment as to Count Six.

## PART E. RECOMMENDED SPECIAL CONDITIONS OF SUPERVISION

127. The defendant shall participate in a program or course of study aimed at improving educational level and/or complete a vocational training program. In the alternative, he shall participate in a job placement program recommended by the Probation Officer.

128. The defendant shall participate in transitional and reentry support services, including cognitive behavioral treatment services, under the guidance and supervision of the Probation Officer. The defendant shall remain in the services until satisfactorily discharged by the service provider with the approval of the Probation Officer.

129. The defendant shall cooperate in the collection of a DNA sample as directed by the Probation Officer, pursuant to the Revised DNA Collection Requirements, and Title 18, U.S. Code Section 3563(a)(9).

130. The defendant shall submit his person, property, house, vehicle, papers, computers (as defined in 18 U.S.C. Section 1030(e)(1)), other electronic communication or data storage devices, and media, to a search conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition.

131. The defendant shall participate in an approved substance abuse monitoring and/or treatment services program. The defendant shall refrain from the unlawful use of controlled substances and submit to a drug test within fifteen (15) days of release; thereafter, submit to random drug testing, no less than three (3) samples during the supervision period and not to exceed 104 samples per year accordance with the Drug Aftercare Program Policy of the U.S. Probation Office approved by this Court. If deemed necessary, the treatment will be arranged by the officer in consultation with the treatment provider. The defendant is

required to contribute to the cost of services rendered (co-payment) in an amount arranged by the Probation Officer based on the ability to pay or availability of third party payment.

## PART F. FACTORS THAT MAY WARRANT A DEPARTURE

132.   The probation officer has not identified any factors that may warrant a departure from the advisory guidelines.

## PART G. SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM

133.   The Court may exercise its discretion by considering a sentence under a variance, pursuant to the provisions of Title 18, U.S.C. §3553(a). The Court may take into consideration the defendant's history and characteristics, the nature and circumstances of the offense, as well as the need to promote respect for the law and afford adequate deterrence for the crimes committed by the defendant.

Respectfully Submitted,
EUSTAQUIO BABILONIA, CHIEF
U.S. PROBATION OFFICER

*s/Milva Razetto*

Milva Razetto
U.S. Probation Officer

Reviewed and approved:

Merangelie Serrano, Supervising
U.S. Probation Officer

24